

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-20-00097-CV

RONAL PEACE AND JACQUETTA L. PEACE, Appellants

V.

PNC BANK NATIONAL ASSOCIATION S/B/M TO NATIONAL CITY BANK S/B/M TO
NATIONAL CITY MORTGAGE CO. D/B/A COMMONWEALTH UNITED MORTGAGE
COMPANY, AS THE SUCCESSOR IN INTEREST OR ASSIGNEE OF NATIONAL CITY
MORTGAGE CO. D/B/A COMMONWEALTH UNITED MORTGAGE A SUBSIDIARY OF
NATIONAL CITY BANK OF INDIANA, BY AND THROUGH ITS DULY AUTHORIZED
MORTGAGE SERVICER PNC MORTGAGE, A DIVISION OF PNC BANK, N.A.,
SUCCESSOR TO NATIONAL CITY BANK, Appellee

On Appeal from the 18th District Court
Johnson County, Texas
Trial Court No. DC-C201600243

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

MEMORANDUM OPINION

After a bench trial, the 18th Judicial District Court of Johnson County, Texas, entered a judgment allowing nonjudicial foreclosure of a home occupied by Ronal and Jacquetta L. Peace, located at 2820 CR 206, Alvarado, Texas, 76009 (the Property), pursuant to the terms of a 2004 Texas home security instrument. Also, after finding that Jacquetta was unjustly enriched, committed fraud by misrepresenting her marital status as single to obtain a home equity loan, and was contractually obligated to pay all amounts owed in connection with a 2004 Texas home equity note, the trial court found Jacquetta personally liable for $505,663.38. The trial court also found that PNC Bank National Association (Bank) had previously paid off a $182,968.83 loan on the Property and $69,862.86 in ad valorem taxes to protect its interest in the Property and, as a result, granted the Bank an equitable first lien on the Property in the amount of $252,831.69, plus prejudgment interest from the date of payoff, which was subject to judicial foreclosure.

On appeal,[1] the Peaces challenge the nonjudicial foreclosure of the 2004 Texas home security instrument, the judgment of Jacquetta's personal liability, and the judicial foreclosure of the equitable lien. The Peaces' challenges to the nonjudicial foreclosure argue foreclosure under the 2004 Texas Home security instrument was barred by the statute of limitations and lack of notice of default. The Peaces next argue that the Bank's remaining causes of action were barred by the statute of limitations and challenge the personal judgment against Jacquetta by claiming (1) that the Bank did not prove its fraud and fraudulent inducement causes of action against her

---

[1]Originally appealed to the Tenth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the Tenth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

and (2) that it was impermissible for the Bank to recover damages on multiple causes of action seeking to hold Jacquetta "personally liable for all amounts owed in connection with the 2004 Texas Home Equity Note." The Peaces also challenge the judicial foreclosure by arguing that (1) the Bank did not prove its claims for equitable subrogation or unjust enrichment for payment of ad valorem taxes, (2) equitable foreclosure on Ronal's homestead interest was improper because the Property was a protected homestead and Ronal was not a party to the contract with the Bank, and (3) the trial court's foreclosure order fails to comply with Rule 309 of the Texas Rules of Civil Procedure. Finally, the Peaces argue that they proved their affirmative defenses of laches.

We find that (1) the nonjudicial foreclosure was not barred by the statute of limitations and no notice of default was required, (2) the Peaces waived their remaining statute of limitations arguments, (3) the Bank was entitled to personal judgment against Jacquetta for amounts owed in connection with the 2004 Texas home equity note because it proved its fraud claims and, as a result, the Peaces' "multiple claims" argument need not be addressed, (4) the Bank was entitled to judicial foreclosure of the equitable lien, and (5) the Peaces did not prove their affirmative defense of laches. However, because we agree that the trial court's judicial foreclosure order did not comply with Rule 309 of the Texas Rules of Civil Procedure, we reverse that portion of the order and remand the matter to the trial court to include the required order of sale language. In all other respects, we affirm the trial court's judgment.

## I. Standard of Review

"When a trial court issues findings of fact and conclusions of law following a bench trial, its findings are reviewable for legal and factual sufficiency of the evidence by the same standards as applied in a review of the legal and factual sufficiency of the evidence to support a jury's finding." *Brazos Valley Roadrunners, LP v. Lee*, No. 10-19-00251-CV, 2021 WL 3191954, at *2 (Tex. App.—Waco July 28, 2021, no pet. h.) (mem. op.) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *see also Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)). "We review the trial court's conclusions of law de novo." *Id.* (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)). "As a reviewing court, we may review the trial court's legal conclusions drawn from the facts to determine their correctness." *Id.*

"When we review a finding for legal sufficiency, we credit evidence that supports the finding if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* (citing *Kroger Tex., Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)).

"In a review of the factual-sufficiency issue, an appellate court must consider all the evidence in the record." *Id.* (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996)). "We may overturn findings only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust." *Id.* "Under either standard of review, the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Id.*

(citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *City of Keller*, 168 S.W.3d at 819).

## II.    Factual and Procedural History

### A.    The Bank Obtains a Lien on the Property

The facts of this case are largely undisputed and based on documentary evidence. Ronal and Jacquetta were married in 1990 and were never divorced. During the marriage, Jacquetta secured a purchase money loan (PM Loan) for $196,200.00 and acquired a warranty deed, with vendor's lien to the Property in 1999. Although the PM Loan was only taken out by Jacquetta, both Jacquetta and Ronal signed the purchase money deed of trust. Jacquetta testified that she alone signed the PM Loan because her credit was better than Ronal's.

In 2003, Jacquetta obtained a renewal and extension loan (R&E Loan) that was used to pay off the PM Loan to secure a first lien position for a renewal and extension deed of trust.[2] As a result of that payoff, the purchase money lien on the Property was released in April 2003.

In 2004, Jacquetta obtained a home equity loan from the Bank for $260,520.00, after signing an affidavit and agreement representing that she was unmarried and that the agreement "include[d] all owners and all spouses of owners of the Property."[3] Jacquetta testified that she

---

[2]The renewal and extension deed of trust provided,

The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens and remedies securing the original holder of a note evidencing Borrower's indebtedness and the original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal and extension of the indebtedness.

[3]The affidavit and agreement also stated,

**B.        Inducement and Reliance.** I understand that my execution of this Texas Home Equity Affidavit and Agreement is made to induce Lender and its successors and assigns to make or purchase the Extension of Credit . . . I also understand that each of the statements made in the

5

listed herself as single instead of married or separated because she intended on getting a divorce and "planned on making payments being single." She also added that "[t]here have been periods of separation" between her and Ronal and clarified that they were separated at the time she applied for the R&E Loan and home equity loan. Even so, Jacquetta admitted that she was married when she signed the documents, that her claim that she was single was a misrepresentation, and that she intended for the Bank to rely on that misrepresentation. Jacquetta executed a "Texas Home Equity Note (Fixed Rate-First Lien)" (HE Note) that matured on July 1, 2019, and provided, "If, on JULY 1, 2019, I still owe amounts under this Note, I will pay those amounts in full on that date." She also signed a 2004 "Texas Home Equity Security Instrument (First Lien)" (HE SI) granting the Bank a home equity lien against the Property to secure Jacquetta's promise to pay the HE Note.[4]

At the closing for the home equity loan, the Bank paid off the $182,968.83 R&E Loan that had extended the original PM Loan to secure a first lien position for the HE SI. As a result, the Peaces obtained a release of the renewal and extension lien.

---

Representations and Warranties section is material and will be acted upon by the Lenders and its assigns, and that if such statement is false or made without knowledge of the truth, the Lenders and its assigns will suffer injury.

**C.        Remedies in the Event of Actual Fraud.** If any owner of the Property, or the spouse of an owner, obtains the Extension of Credit by actual fraud, then each owner, spouse of each owner and all borrowers named in the Note agree to indemnify and save Lender and its successors and assigns harmless against any loss, costs, damages, attorneys fees, expenses and liabilities which Lender may incur or sustain in connection with such actual fraud and . . . will pay the same upon demand. In addition, the borrowers named in the Note may become personally liable for repayment of the Extension of Credit.

The home equity note contained similar language.

[4]The HE SI required the borrower to pay all "taxes, assessments, charges, fines, and impositions attributable to the Property which [could] attain priority over [that] Security Instrument."

6

## B. The Bank's Attempts to Collect on Debt

The Peaces had trouble making payments on the home equity loan. Over the course of several years, the Bank initiated multiple attempts to collect the past due debt, which the Peaces rely on for their statute of limitations argument.

In January 2006, the Bank sent a notice of default stating that monthly installment payments had not been made and that payment of $14,704.93 was required to cure the default. The notice stated that failure to cure would result in acceleration of the maturity date of the HE Note. When the requested payment was not made, Jacquetta received a letter from a law firm stating that the Bank had authorized it to initiate legal proceedings in connection with the foreclosure of the HE SI.[5] When she received that letter, Jacquetta entered into a forbearance agreement that required her to pay $8,000.00 upfront and the remaining $13,697.26 on a strict schedule to cure the default and prevent foreclosure.[6] The April 2006 forbearance agreement provided that, if Jacquetta failed to pay in accordance with its terms, the Bank could immediately proceed with pursuit of its rights and remedies under the HE SI without further demand or notice other than the time and place of a trustee's sale.

In February 2007, Jacquetta received another notice of default and intent to accelerate. That notice informed Jacquetta that she had a $32,350.52 balance and thirty days to cure the default to prevent acceleration of the HE Note. A verified application for a home equity foreclosure order was filed in April 2007 with the 413th Judicial District Court of Johnson

---

[5]A home equity foreclosure application was filed with a Johnson County district court in February 2006, but the case was dismissed after Jacquetta agreed to the forbearance agreement.

[6]Jacquetta was still required to make regular monthly payments under the HE Note.

7

County, Texas, which entered a default home equity foreclosure order authorizing a foreclosure sale in July 2007. Yet, Jacquetta declared bankruptcy in 2007, and Michael Bevins, the Bank's default litigation specialist, testified that the account remained in "bankruptcy status" until the bankruptcy was dismissed in 2009.

In February 2009, Jacquetta provided written notice authorizing the Bank to discuss all aspects of the home equity loan with Ronal. That March, Jacquetta received another notice that the past due balance was $66,021.46 and that she had thirty days to cure to prevent acceleration of the debt. Another verified application for home equity foreclosure order was filed in the Johnson County district court, and another default home equity foreclosure order authorizing a foreclosure sale was entered on July 7, 2009.

On July 20, 2009, Ronal granted the Bank written permission for his "credit to be checked in reference to the . . . mortgage loan." On August 30, 2009, Ronal and Jacquetta both signed a Home Affordable Modification Program Hardship Affidavit and Home Affordable Modification Trial Period Plan (Modification Trial) that listed them both as borrowers of the home equity loan and contained an executed agreement stating, "In order to qualify for [the Bank's] offer to enter into an agreement to modify my loan[, t]he Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Document." Ronal also acknowledged his understanding that the Bank would "use [his] information to evaluate [his] . . . eligibility for a loan modification . . . , but [that] the [Bank] was not obligated to offer . . . assistance based solely on the representations in [his] affidavit." Bevins characterized the Modification Trial as a request to include Ronal as a co-borrower and testified that the language

8

binding Ronal to the "terms and provisions of the Loan Document" was necessary for the Bank's consideration of any loan modification. The Modification Trial also provided that the "Lender [would] have all of the rights and remedies provided by the Loan Documents" if the Peaces did not make the required payments. The Peaces both agreed to a "Trial Period Plan," which allowed them to make reduced payments that were "estimate[s] of the payment that [would] be required under the modified loan terms" in September, October, and November. According to Bevins, the Peaces failed to timely make all of the required reduced payments. Bevins testified that, as a result, the loan modification request was not approved.[7] Ronal also listed himself as a "Co-Borrower" in 2010 on a Form 1126 for consideration of a Freddie Mac workout option and "Co-Mortgagor" in a 2016 affidavit agreeing to indemnify and hold harmless the Bank "against any and all claims, damages, loss liabilities, reasonable costs or expenses whatsoever to any and all improvements or repairs made to the referenced property."

In March 2010, the Bank sent notice to Jacquetta that the past due amount was $87,945.59. On April 22, 2010, Jacquetta received notice that the Bank had decided to accelerate the debt. In September 2010, another verified application for home equity foreclosure order was filed but was voluntarily dismissed in January 2011. Jacquetta testified that she did not know why the case was dismissed and that she had not come to any kind of agreement with the Bank on her debt. In February 2011, Jacquetta received another notice that the Bank had again decided to accelerate the debt.

---

[7]Bevins testified that additional paperwork would have been signed by Ronal on approval of the request to include him as a co-borrower.

9

In January 2013, the Bank sent Jacquetta notice that it was rescinding all prior notices of acceleration but was not waiving its rights "to accelerate and collect in the future the debt owed by Borrower." The Bank also agreed "that Borrower may continue to pay the indebtedness due Mortgagee pursuant to the terms of the debt secured by the Deed of Trust." On February 19, 2013, Jacquetta received another notice of acceleration and was told that the amount of the debt was $340,457.22. A verified home equity foreclosure order was filed in June 2013, but the case was dismissed for want of prosecution in June 2016 after the Bank filed this lawsuit on April 29, 2016, naming Ronal as a party for the first time.

In January 2016, the Bank sent Jacquetta another notice that all prior notices of acceleration were rescinded but that it did not waive its rights "to accelerate and collect in the future the debt owed by Borrower." While the Bank did not agree to an offer of payment less than the full amount of the loan after acceleration, the Bank agreed that Jacquetta could continue to pay the debt pursuant to the terms of the HE SI.

## C. The Bank Sues the Peaces

In its 2019 amended petition against the Peaces, filed after the maturity date of the HE Note, the Bank asserted claims of fraud, fraudulent inducement, and unjust enrichment against Jacquetta for misrepresenting her marital status to secure the home equity loan and sought declaratory judgment that the HE SI was valid as to Jacquetta and Ronal and could be nonjudicially foreclosed. The Bank also sought (1) contractual and equitable subrogation for the $69,862.86 it had spent to pay the Peaces' ad valorem taxes since 2004 and for the $182,968.63

10

they expended to pay off the R&E Loan, (2) equitable liens of these sums, and (3) a declaratory judgment for judicial foreclosure of the equitable liens.

At trial, Jacquetta admitted that she had not made any payments on the HE Note since 2009 and had not paid property taxes since 2004. Bevins admitted that the Bank never made a demand for anything less than the full amount due under the HE Note after the notices of acceleration were last rescinded in 2016. Bevins testified that the Bank had paid $69,862.86 in ad valorem taxes to protect its lien position on the Property over the course of ten years, that the Bank had paid the homeowner's insurance on the Property, and that the total debt owed to the Bank was $529,361.14, which included taxes and homeowner's insurance.

## III. The Foreclosure Was Not Barred by the Statute of Limitations and No Notice of Default Was Required

Under the Texas Civil Practice and Remedies Code, "[a] person must bring suit for the recovery of real property under a real property lien or the foreclosure of a real property lien not later than four years after the day the cause of action accrues." TEX. CIV. PRAC. & REM. CODE ANN. § 16.035(a). Under the Texas Business and Commerce Code, an action to enforce the obligation to pay an accelerated note must be commenced "within six years after the accelerated due date." TEX. BUS. & COM. CODE ANN. § 3.118(a).

The Peaces contend that the Bank's cause of action for foreclosure accrued on April 22, 2010, when the Bank sent its first notice of acceleration of the debt under the HE Note. They argue that there was "no letter effectively rescinding" the April 2010, February 2011, and February 2013 notices of acceleration because the 2013 and 2016 notices of recission did not constitute an actual abandonment of the accelerations since they did not request payment on less

11

than the full amount of the loan. The Peaces also argue that the Bank never mailed any letter after April 2010 that demanded payment for a balance less than the full amount owed.

As a general rule, the accrual date for the four-year statute of limitations for a foreclosure "is the maturity date of the note, rather than the date of a borrower's default." *Citibank N.A. as Tr. for NRZ Pass-Through Tr. VI v. Pechua, Inc.*, 624 S.W.3d 633, 637 (Tex. App.—Houston [14th Dist.] 2021, pet. filed) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 16.035(e)). "If, as here, the security instrument contains an optional acceleration clause, the cause of action accrues when the lender exercises its option to accelerate the maturity date of the note." *Id.* (citing *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 566 (Tex. 2001)). "Effective acceleration requires both notice of intent to accelerate and notice of acceleration, and both notices must be clear and unequivocal." *Id.* at 637–38.

"Once a debt has been accelerated, the note holder may unilaterally waive or abandon the acceleration so long as the borrower neither objects to the abandonment nor detrimentally relied on the acceleration." *Florey v. U.S. Bank Nat'l Ass'n, Tr. for RMAC Tr., Series 2016-CCT*, No. 05-20-00306-CV, 2021 WL 2525457, at *4 (Tex. App.—Dallas June 21, 2021, no pet.) (mem. op.) (citing *Ankus, L.L.C. v. U.S. Bank Trust, Nat'l Ass'n*, No. 01-18-00777-CV, 2020 WL 4118025, at *3 (Tex. App.—Houston [1st Dist.] July 21, 2020, pet. denied) (mem. op.)). Here, the trial court entered findings of fact and conclusions of law concluding that the Bank had abandoned all prior notices of acceleration, that there was "no current acceleration of the [HE] Note," that the maturity date of the note was July 1, 2019, and that the Bank was entitled to foreclose under the terms of the HE SI.

12

Abandonment "can restore the original maturity date—and therefore reset the running of limitations—. . . as though [the acceleration] never happened." *Citibank*, 624 S.W.3d at 638 (citing *Holy Cross*, 44 S.W.3d at 566–67). "Abandonment is based on the concept of waiver and requires proof that the party has an existing right, has actual knowledge of the right, and intends to relinquish the right or engages in intentional conduct inconsistent with the right." *Id.* (citing *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008)). "Intent is the critical element, and its manifestation must be unequivocal." *Id.* (citing *Swoboda v. Ocwen Loan Servicing, LLC*, 579 S.W.3d 628, 633 (Tex. App.—Houston [14th Dist.] 2019, no pet.)).

"Abandonment can occur either expressly through a clear repudiation of the right, or impliedly through conduct inconsistent with a claim to the right." *Florey*, 2021 WL 2525457, at *4 (citing *Ankus*, 2020 WL 4118025, at *3). "In the absence of other evidence, communications sent to the borrower 'replete with language inconsistent with the then-present right to foreclose' will compel the conclusion that the lender abandoned its acceleration of the debt." *Id.* (quoting *NSL Prop. Holdings, LLC v. Nationstar Mortg. LLC*, No. 02-16-00397-CV, 2017 WL 3526354, at *5 (Tex. App.—Fort Worth Aug. 17, 2017, pet. denied) (mem. op.)). "Whether acceleration has been effectively abandoned is a question of law when the relevant facts are undisputed." *Id.* (citing *Graham v. LNV Corp.*, No. 03-16-00235-CV, 2016 WL 6407306, at *3 (Tex. App.—Austin Oct. 26, 2016, pet. denied) (mem. op.)).

"Texas courts have consistently held that a lender may abandon acceleration by sending subsequent notices seeking payment of less than the full amount of the loan when such correspondence 'unequivocally manifests an intent to abandon the prior acceleration.'" *Id.*

13

(citing *Ernst v. Ocwen Loan Servicing, LLC*, No. 1:18-CV-428-RP, 2019 WL 7761444, at *5 (W.D. Tex. Nov. 22, 2019) (order); *Citibank*, 624 S.W.3d at 637). "Language inconsistent with acceleration and a present right to foreclose can manifest such intent." *Id.* (citing *Boren v. U.S. Nat'l Bank Ass'n*, 807 F.3d 99, 106 (5th Cir. 2015); *NSL*, 2017 WL 3526354, at *5).

Here, Jacquetta received her first two notices of default in 2006 and 2007 and declared bankruptcy in 2007, which was not dismissed until 2009. After the bankruptcy was dismissed, Jacquetta received notices of acceleration in April 2010 and February 2011, but the Bank sent a letter rescinding those notices in January 2013.[8] Although another notice of acceleration was received in 2013, the Bank sent a notice of recission in 2016. We agree that neither the 2013 nor the 2016 notice of recission demanded payment of less than the full amount of the home equity loan but disagree with the Peaces' argument that the cause of action accrued in April 2010 as a result.

A notice following an acceleration seeking payment of less than the full amount of the loan is only one method to establish abandonment. "The best means of achieving an abandonment is through written notice of rescission." *Citibank*, 624 S.W.3d at 638. "As with the voluntary prepayment language, statements regarding a possible right to foreclose in the future . . . are . . . inconsistent with acceleration and a then-present right to foreclose." *Florey*, 2021 WL 2525457, at *4. "A notice regarding optional, voluntary prepayment of part or all of the mortgage balance is clearly antithetical to acceleration of the loan." *Id.* (citing *Affiliated*

---

[8]"[F]iling for bankruptcy tolls the running of limitations" for foreclosures. *Citibank*, 624 S.W.3d at 639.

14

*Capital Corp. v. Commercial Fed. Bank*, 834 S.W.2d 521, 526 (Tex. App.—Austin 1992, no writ) (contrasting voluntary prepayment of loan from payment based on acceleration)).

Here, both the 2013 and 2016 notices were titled "RESCISSION OF ACCELERATION" and stated that the Bank was rescinding all prior notices of acceleration, provided that Jacquetta could continue to pay under the terms of the HE SI instead of requiring a lump sum payment of the accelerated amount, and specified that the Bank was not waiving its rights "to accelerate and collect in the future the debt owed by Borrower." We find that the trial court correctly ruled that this language unequivocally demonstrated an intent to abandon the notices of acceleration. *See id.*; *Citibank*, 24 S.W.3d at 640–41.

"When acceleration is abandoned, the contract is restored to its original condition, including restoring the loan's original maturity date and resetting the statute of limitations." *Florey*, 2021 WL 2525457, at \*4 (citing *NSL*, 2017 WL 3526354, at \*5). Because the Bank effectively abandoned all prior notices of intent to accelerate the debt, the statute of limitations did not accrue until the July 1, 2019, maturity date in the HE Note.

Also, we reject the Peaces' arguments that the "foreclosure [was] barred without an acceleration" and that the Bank was required to provide another notice of default and intent to accelerate. A "remedy by foreclosure" after a "note ha[s] matured and not been paid . . . [does] not require notice" of default and acceleration. *Branch Banking & Tr. Co. v. TCI Luna Ventures, LLC*, No. 05-12-00653-CV, 2013 WL 1456651, at \*5 (Tex. App.—Dallas Apr. 9, 2013, no pet.) (citing *Deposit Ins. Bridge Bank, N.A. v. McQueen*, 804 S.W.2d 264, 267 (Tex. App.—Houston [1st Dist.] 1991, no writ) (notice of acceleration not required when note matures on its own

15

terms)); *see Affordable Motor Co. v. LNA, LLC*, 351 S.W.3d 515, 521 (Tex. App.—Dallas 2011, pet. denied). As a result, we overrule the Peaces' first point of error.

## IV. The Peaces Waived Their Remaining Limitations Arguments

As for the Peaces' remaining claims, a four-year statute of limitations applies to claims for fraud and equitable liens, and a two-year statute of limitations applies to unjust enrichment claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.003, 16.004(a)(4), 16.051; *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 869 (Tex. 2007); *Chorman v. McCormick*, 172 S.W.3d 22, 25 (Tex. App.—Amarillo 2005, no pet.). The Peaces argue that (1) the Bank's cause of action for equitable lien accrued in 2003 when Jacquetta filed a tax return listing her marital status as married filing jointly, or at least when the Bank became aware of Ronal's homestead interest due to his involvement in the Loan Modification Trial;[9] (2) the Bank's fraud and fraudulent inducement claims were barred by the statute of limitations because the alleged misrepresentation occurred in 2004 and the Bank was aware that Jacquetta and Ronal were married by at least 2010; (3) the unjust enrichment claim for the R&E Loan payoff accrued at the home equity loan closing and expired in 2006; and (4) the unjust enrichment claims for ad valorem taxes paid before the two-year mark prior to the Bank's assertion of those claims were barred by limitations. We find these issues waived.

A complaint that a cause of action is barred by the statute of limitations is an affirmative defense that must be pled. *See* TEX. R. CIV. P. 94. Because a defendant has "the burden to 'plead, prove, and secure findings to sustain [his] plea of limitations,'" failure to plead an

---

[9]Jacquetta testified that the Bank was aware that she had listed her status as married on tax returns nine years before filing the fraud claims against her.

16

affirmative defense "waives any objection on appeal." *Estate of Lopez*, No. 10-18-00278-CV, 2021 WL 2252138, at \*10 (Tex. App.—Waco May 21, 2021, pet. filed) (mem. op.) (quoting *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988)); *see Tex. All Risk Gen. Agency, Inc. v. Apex Lloyds Ins. Co.*, No. 10-10-00017-CV, 2010 WL 4572738, at \*5 (Tex. App.—Waco Nov. 10, 2010, no pet.) (mem. op.). "This burden includes establishing when the plaintiff's cause of action accrued to demonstrate the bar of limitations." *City of Justin v. Rimrock Enters., Inc.*, 466 S.W.3d 269, 278–79 (Tex. App.—Fort Worth 2015, pet. denied).

Here, the Peaces raised several affirmative defenses in their answer, including a statute of limitations defense with respect to the foreclosure action,[10] which we addressed above. However, we find that the answer did not raise the issue of limitations as to the Bank's remaining claims. The trial court made no finding on limitations although it entered a general conclusion of law that "[a]ll affirmative defenses . . . [were] denied." On this record, we find that the Peaces neither raised nor secured express findings on the issue of statute of limitations with respect to the Bank's remaining claims. Instead, they waited to file a motion for new trial to assert arguments that the statute of limitations barred the Bank's remaining claims, but those arguments were untimely. *See Lopez*, 2021 WL 2252138, at \*10 n.3 (statute of limitations defense raised in a motion for new trial does not preserve a limitations defense). Because the Peaces did not plead the statute of limitations as an affirmative defense to the Bank's remaining causes of action and failed to secure required findings, we find that they waived this point of error.

---

[10]In an attempt to meet their burden with respect to the foreclosure, the Peaces' answer specifically listed the statute of limitations as to the Bank's suit for foreclosure.

17

**V.**     **The Bank Was Entitled to the Personal Judgment Against Jacquetta**

The Peaces challenge the trial court's finding that Jacquetta was personally liable for all amounts owed in connection with the HE Note "contractually . . . [and] also based upon unjust enrichment, fraud, and fraudulent inducement, including interest, which at the time of trial was $505,663.38." They argue that the Bank was not entitled to a personal judgment against Jacquetta because it failed to prove its fraud claims and because the same damages were awarded for multiple claims.

The Peaces argue that, because the Bank failed to prove its fraud claims, it is not entitled to the remedies and contractual sums agreed to by Jacquetta in the event of actual fraud. To prove fraud, a party must show the following:

> (1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Newman v. Sivam*, No. 10-19-00192-CV, 2020 WL 103756, at *3 (Tex. App.—Waco Jan. 8, 2020, no pet.) (mem. op.) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)). "Under the common law, a plaintiff establishes a fraudulent inducement claim by showing the elements of 'a simple fraud claim.'" *Fletcher v. Edwards*, 26 S.W.3d 66, 77 (Tex. App.—Waco 2000, pet. denied).

Here, Jacquetta admitted (1) that she was married when she signed the documents and (2) that her claim that she was single was a misrepresentation. Even though Jacquetta may have intended to divorce Ronal in the future, she knew that she was not single when she signed the

18

home equity loan documents. Jacquetta also admitted that she intended for the Bank to rely on her misrepresentation.[11] The trial court found, and the evidence supported the finding, that the Bank relied on Jacquetta's misrepresentation and was damaged when it issued the home equity loan and paid off the R&E Loan. As a result, sufficient evidence supported the trial court's findings on the Bank's fraud claims, and the Peaces cannot show that those findings were so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. As a result, the trial court's conclusion that the Bank was entitled to a judgment that Jacquetta was personally liable for the home equity loan under the terms of her 2004 affidavit and agreement with the Bank will not be disturbed. Since that conclusion is dispositive of the Bank's entitlement to personal judgment against Jacquetta, we need not address the Peaces' complaint that the award was based on other causes of action.

We overrule the Peaces' challenges to the personal judgment against Jacquetta.

## VI.   The Bank Was Entitled to Judicial Foreclosure of the Equitable Lien

Article XVI, Section 50, of the Texas Constitution provides, in relevant part,

(a)     The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for:

    (1)     the purchase money thereof, or a part of such purchase money;

    (2)     the taxes due thereon;

---

[11]The Peaces also argue that the Bank could not justifiably rely on Jacquetta's representations because there were "red flags" indicating that reliance was unwarranted. In other words, the Peaces contend that the Bank's reliance on Jacquetta's 2004 statement that she was single was not justified. However, "[w]hen one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for damages based upon a plea that the party defrauded might have discovered the truth by the exercise of proper care." *Koral Indus. v. Sec.-Connecticut Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990) (quoting *Isenhower v. Bell*, 365 S.W.2d 354, 357 (Tex. 1963)); *see Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983).

19

. . . .

(6)    an extension of credit that:

(A)    is secured by a voluntary lien on the homestead created under a written agreement with the consent of each owner and each owner's spouse . . . [and] . . .

. . . .

(Q)    is made on condition that:

. . . .

(xi)    the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if . . . the lien was not created under a written agreement with the consent of each owner and each owner's spouse, unless each owner and each owner's spouse who did not initially consent subsequently consents.

TEX. CONST. art. XVI, § 50.  The Peaces argue that the Bank is not entitled to an equitable lien on the Property because Ronal testified that he had not given consent or signed any document pledging his interest in the homestead as collateral for any loan other than the original purchase money deed of trust.[12]  Also, the Peaces argue that the Bank did not have any documentation specifically showing that Ronal acknowledged that his interest in the Property was subject to the home equity loan.[13]  Citing to this evidence, the Peaces argue that the trial court erred by

---

[12]The Peaces' brief does not challenge the nonjudicial foreclose on these grounds.  Their only arguments with respect to the nonjudicial foreclosure involve the statute of limitations and notice arguments we addressed above.  The Peaces' challenges to the trial court's findings that Ronal consented to the HE Note and HE SI are made solely in reference to the equitable lien.  Further, we note that the trial court made no express finding that the Property was Ronal's homestead at the time Jacquetta entered into the home equity loan, and the testimony showed that Ronal and Jacquetta had separated during that time.  In any event, for purposes of the analysis related to the equitable lien, we will presume that the Property was Ronal's homestead.

[13]In support, the Peaces cite to this portion of Bevins's testimony:

20

granting an equitable lien on Ronal's interest in the homestead Property.[14]  Because the finding

that the Bank was entitled to an equitable lien against Ronal's interest in the Property was not

against the great weight and preponderance of the evidence, we disagree.

---

Q      (By [the Peaces]) Mr. Bevins, is there any document that PNC has where Mr. Peace acknowledged or stated to the effect of "my interest in this property is subject to the home equity loan"?

A      There's nothing specific to that point.  It would simply be where there's been a reflection as a representation of that being the co-borrower.

Q      Now those were the documents for the HARM loan, is that correct, or the HARM modification?

A      That is true, yes.

Q      And that was simply an application for a modification and a representation if the modification was granted, then I would be responsible.  Isn't that the way that works?

A      Well, normally it's reflective of the current status of the borrowers when they make application to modify that existing debt.

Q      Okay.  But in that application didn't Mr. Peace -- it was an offer that was not accepted; isn't that correct?

A      There was an offer to use income, yes.

Q      There was an offer by Mr. and Ms. Peace to modify the loan and that offer to modify was not accepted by PNC; isn't that correct?

A      It was not approved, yes.

Q      So there were no documents ever signed by Mr. Peace to put up his interest in the property is that -- as collateral for the loan; is that right?

A      There was nothing signed specific to the security interest, but as you had stated, the modification application did reference it as co-owner.

Q      But you're only a co-borrower if there is actually a loan funded; isn't that right?

[By the Bank]    Objection.

THE COURT      And basis?

[By the Bank]:    He's asking to speculate and -- and to state a proposition of the law.

THE COURT:      Sustained.

Q      (By [the Peaces]) There is no document that lists Mr. Peace as a co-borrower other than the HARM modification application.

A      I believe that's true.

Q      Okay.  And as you sit here, you don't know Mr. Peace's intent in signing as co-borrower on that application, do you?

A      I couldn't beyond just the signature on the line of the co-borrower.

Ronal testified that he would have put up his interest in the Property as collateral for the loan if the modification would have been approved, but it never was.

[14]Except for the limitations and notice arguments addressed above, the Peaces do not challenge the nonjudicial or judicial foreclosure of Jacquetta's interest in the Property.

"Equitable subrogation may be invoked to prevent unjust enrichment when one person confers upon another a benefit that is not required by legal duty or contract." *Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 337 (Tex. 1980). "A right to subrogation is often asserted by one who pays a debt owed by another." *Id.* The doctrine of equitable subrogation is interpreted "liberally." *Frymire Eng'g Co. ex rel. Liberty Mut. Ins. Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142 (Tex. 2008). It applies "in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." *Id.*

"If entitled to full subrogation, the payor is allowed to enforce the rights available to the creditor, such as rights against the debt's security." *Smart*, 597 S.W.2d at 337. "Subrogation to the creditor's rights is available, however, only when the debtor was enriched unjustly; thus, the payor who confers a benefit as a 'mere volunteer' is not entitled to this remedy." *Id.* (quoting *Oury v. Saunders*, 13 S.W. 1030, 1031 (Tex. 1890)); *see Frymire Eng'g*, 259 S.W.3d at 142 ("Thus, a party seeking equitable subrogation must show it involuntarily paid a debt primarily owed by another in a situation that favors equitable relief."). *Id.* The Peaces argue that the Bank voluntarily paid off the R&E Loan and the property taxes. We disagree.

"Equitable subrogation holdings . . . describe involuntary payments as . . . payments that are made 'for the protection of some interest of the party making the payment.'" *Id.*; *see Frymire Eng'g*, 259 S.W.3d at 145 (quoting *Galbraith-Foxworth Lumber Co. v. Long*, 5 S.W.2d 162, 167 (Tex. App.—Dallas 1928, writ ref'd)). Here, the trial court found that the Bank had

22

paid off the R&E Loan to secure a first lien position, and Bevins testified that the Bank had paid the Property's ad valorem taxes for the same reason.

"The doctrine of equitable subrogation has been repeatedly applied to preserve lien rights on homestead property." *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 619 (Tex. 2007) (Moreover, even "[i]nvalidation of a contractual lien does not preclude equitable subrogation."). Thus, "[u]nder Texas law, a lender who discharges a prior, valid lien on the borrower's homestead property is entitled to subrogation, even if the lender failed to correct a curable defect in the loan documents under § 50 of the Texas Constitution." *Fed. Home Loan Mortg. Corp. v. Zepeda*, 601 S.W.3d 763, 769 (Tex. 2020). This is because, under the common law, "[i]n the mortgage context, the doctrine allows a lender who discharges a valid lien on the property of another to step into the prior lienholder's shoes and assume that lienholder's security interest in the property, even though the lender cannot foreclose on its own lien." *Id.* at 766. Here, because the Bank paid off the R&E Loan, which was an extension of the valid PM Loan, it was entitled to subrogation of the balance due on the R&E Loan, as well an equitable lien subject to foreclosure in that amount. *See id.* at 766–67 (citing *Tex. Land & Loan Co. v. Blalock*, 13 S.W. 12, 13–14 (Tex. 1890)); *see LaSalle Bank*, 246 S.W.3d at 619 ("We have honored equitable subrogation claims against homestead property when a refinance, even though unconstitutional, was used to pay off valid liens.).

Also, "one who pays real property taxes assessed while the property was owned by another" can assert "a right to be subrogated to the taxing authority's constitutional and statutory lien." *Smart*, 597 S.W.2d at 337–38. Whether the payment is voluntary depends on the nature of

23

the relationship between the parties. For example, a "mortgagee's interest in the security of his mortgage makes him more than a 'mere volunteer' when he pays taxes owed by the mortgagor." *Id.* at 338. "Because the relationship between the mortgagor and mortgagee is contractual, the extent to which the mortgagee is subrogated to the taxing authority's rights may be addressed in the documents representing their agreement, particularly in the deed of trust." *Id.* Here, the HE SI required payment of all "taxes, assessments, charges, fines, and impositions attributable to the Property which [could] attain priority over [the] Security Instrument." As a result, we find that the Bank was entitled to equitable subrogation for its payment of property taxes, as well as an equitable lien for the amount of ad valorem taxes paid. *See id.* ("Under this lien, liability for taxes is secured by the property and may be enforced by foreclosure." (citing TEX. CONST. art. VIII, § 15)); *Swoboda v. Ocwen Loan Servicing, LLC*, 579 S.W.3d 628, 638 (Tex. App.— Houston [14th Dist.] 2019, no pet.).

We conclude that the trial court's finding that the Bank had established its right to equitable subrogation and its grant of an equitable lien in the amount of $252,831.69 was not against the great weight and preponderance of the evidence. *See LaSalle Bank*, 246 S.W.3d at 620 (Section 50 of Article XVI of the Texas Constitution "does not abrogate this longstanding common law principle or preclude [the] Bank's entitlement to equitable subrogation for the refinance portion of the loan proceeds that were used to extinguish [borrower]'s constitutionally permissible purchase-money and property-tax liens.").

Next, the Peaces argue that the trial court's judgment that the Bank was entitled to judicial foreclosure of the Property did not comply with Rule 309 of the Texas Rules of Civil Procedure, which pertains to judicial foreclosures and states:

> Judgments for the foreclosure of mortgages and other liens shall be that the plaintiff recover his debt, damages and costs, with a foreclosure of the plaintiff's lien on the property subject thereto, and . . . that an order of sale shall issue to any sheriff or any constable within the State of Texas, directing him to seize and sell the same as under execution, in satisfaction of the judgment; and, if the property cannot be found, or if the proceeds of such sale be insufficient to satisfy the judgment, then to take the money or any balance thereof remaining unpaid, out of any other property of the defendant, as in case of ordinary executions.

TEX. R. CIV. P. 309. The Peaces contend that the order is void. While we agree that the order of sale language and other provisions of Rule 309 must be included in the judgment, we disagree that the statutory deficiencies render the judgment void. Instead, the proper remedy is to reverse and remand to the trial court to enter an order complying with Rule 309. *See Cowboy's Retail & Wholesale Beverage Distrib., LLC v. Davis*, No. 12-19-00249-CV, 2020 WL 4463126, at *9 (Tex. App.—Tyler July 31, 2020, pet. denied) (mem. op.); *Brown v. EMC Mortg. Corp.*, 326 S.W.3d 648, 653 (Tex. App.—Dallas 2010, pet. denied).

## VII. The Peaces Did Not Prove Their Affirmative Defense of Laches

Next, the Peaces argue that the trial court's denial of their affirmative defense of laches was against the great weight and preponderance of the evidence. "In order to prevail on a claim of laches, a party must show (1) an unreasonable delay by the other party in asserting a legal or equitable right; and (2) a good faith change in position to his detriment by the party asserting laches due to the delay." *Davis v. Mangan*, No. 14-04-00650-CV, 2005 WL 1692048, at *5 (Tex. App.—Houston [14th Dist.] July 21, 2005, no pet.) (mem. op.) (citing *Rogers v. Ricane*

25

*Enter., Inc.*, 772 S.W.2d 76, 80 (Tex. 1989)); *see In re Laibe Corp.*, 307 S.W.3d 314, 318 (Tex. 2010) (orig. proceeding) (per curiam) (to invoke the equitable doctrine of laches, the moving party ordinarily must show, among other things, detrimental change in position because of delay); *Brink v. Fid. Bank of Fort Worth*, 966 S.W.2d 684, 684 (Tex. App.—Fort Worth 1998, no pet.) ("The defense of laches precludes a plaintiff from asserting legal rights after an unreasonable delay against a defendant who has changed his position in good faith and to his detriment because of the delay."). The defense is only available in "extraordinary circumstances." *Davis*, 2005 WL 1692048, at *5; *see Ditech Servicing, LLC v. Perez*, No. 13-17-00123-CV, 2018 WL 4171358, at *5 (Tex. App.—Corpus Christi Aug. 31, 2018, pet. denied) (mem. op.); *see Brink*, 966 S.W.2d at 684.

The Peaces' argument is premised on the contention that the majority of the Bank's causes of action accrued before 2004 and their testimony that the passage of time had hampered their memories. We previously determined that the Bank's nonjudicial foreclosure action was filed within the statute of limitations and that the Peaces have waived their remaining limitations arguments. Also, the trial court was free to find from this record that nothing showed that the Peaces underwent a good faith, detrimental change in their position due to the delay. The facts of this case involving nonpayment of home equity loan obligations and property taxes were largely uncontested, and Jacquetta readily admitted to her acts of fraud. As a result, we cannot say that the trial court's denial of the Peaces' affirmative defense of laches was so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. We overrule the Peaces' last point of error.

26

## VIII. Conclusion

We reverse the trial court's order related to the judicial foreclosure and remand the matter to the trial court for rendition of an order of sale complying with Rule 309 of the Texas Rules of Civil Procedure. In all other respects, the trial court's judgment is affirmed.

Ralph K. Burgess
Justice

Date Submitted:     August 13, 2021
Date Decided:       November 22, 2021

27